PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

WESTERN WORLD INSURANCE
COMPANY,

      Plaintiff-Appellant,

v.

MARKEL AMERICAN INSURANCE
COMPANY,

      Defendant-Appellee.

No. 11-6107

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:10-CV-00811-W)**

---

Clayton B. Bruner (Gerard F. Pignato with him on the briefs), Pignato, Cooper, Kolker & Roberson, P.C., Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Camille Johnson (Gary N. Schumann with her on the brief), Savrick, Schumann, Johnson, McGarr, Kaminski & Shirley, LLP, Dallas, Texas, for Defendant-Appellee.

---

Before **BRISCOE,** Chief Judge, **GORSUCH** and **MATHESON**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

      Haunted houses may be full of ghosts, goblins, and guillotines, but it's their

more prosaic features that pose the real danger. Tyler Hodges found that out

when an evening shift working the ticket booth ended with him plummeting down an elevator shaft. But as these things go, this case no longer involves Mr. Hodges. Years ago he recovered from his injuries, received a settlement, and moved on. This lingering specter of a lawsuit concerns only two insurance companies and who must foot the bill. And at the end of it all, we find, there is no escape for either of them.

The problems began at the front door of the Bricktown Haunted House in Oklahoma City. There Mr. Hodges was working the twilight hours checking tickets as guests entered. When the flashlight he used began flickering and then died, he ventured inside in search of a replacement. To navigate his way through the inky gloom, Mr. Hodges used the light of his cell phone. But when an actor complained that the light dampened the otherworldly atmosphere, Mr. Hodges turned it off and stumbled along as best he could. He was aiming for the freight elevator, where (imprudently, it turns out) spare flashlights were stored. When he reached the elevator, Mr. Hodges lifted the wooden gate across the entrance and stepped in. But because of the brooding darkness, Mr. Hodges couldn't see that the elevator was on a floor above him and he crashed 20 feet down the empty elevator shaft.

It is here the insurance companies enter the picture. Mr. Hodges sued Brewer Entertainment, the haunted house's operator, for various torts. But no doubt wary of liability arising from its occult operation, Brewer had attended well

to its insurance needs. It held two separate insurance policies, one with Western World Insurance Company and another with Markel American Insurance Company. Brewer quickly looked to them to defend the lawsuit and ultimately pay any award. For its part, Western World had thought far enough in advance to exclude from its haunted house coverage "any claim arising from chutes, ladders, . . . naked hangman nooses, . . . trap doors . . . [or] electric shocks." ROA at 55. But it hadn't thought to exclude blind falls down elevator shafts, so it admitted coverage and proceeded to defend Mr. Hodges's suit. Markel, however, balked, refusing to defend or pay any claim.

And that's the nub of the matter. Western World wants Markel to fork over half the cost it incurred in defending — and eventually settling — Mr. Hodges's claim. At summary judgment before the district court, Western World pointed out that Markel's policy covers Brewer for its haunted house operation and the very sort of accident that occurred here. In reply, Markel directed the court to an "escape clause" that, it said, allowed it to elude the liability that would otherwise arise from the terms of its policy. Ultimately, the district court agreed with Markel, found the escape clause a viable escape hatch, and entered summary judgment in Markel's favor — a decision, naturally enough, Western World now appeals.

First, though, we can identify some common ground. The parties agree that if the escape clause does not apply, Markel's policy affords coverage for the

Hodges accident and requires it to reimburse Western World for its fair share of the attorney fees and the cost of the settlement (all in an amount the district court would have to determine on remand). *See* Markel Br. at 24-25. That is because of the Oklahoma doctrine of equitable contribution, which "apportion[s] a loss between two or more insurers who cover the same risk so that each pays his fair share of a common obligation, and one co-insurer does not profit at the expense of the others." *United States Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 832 (Okla. 2001). The only issue in this appeal, the parties agree, is whether the escape clause lets Markel escape liability.

Viewed in isolation, the clause seems to suggest as much. It provides that "[t]his insurance shall not apply to any entity that is already an insured under any other insurance provided by any company. . . ." ROA at 72. This seems a clear statement (or as clear a statement as one is likely to find in a densely drafted commercial insurance contract) disclaiming liability in the very circumstances we face.

But like so much else about this case, things are not always as they first appear. However appealing in isolation, Markel's argument faces serious problems when viewed in context. The escape clause does not appear in Markel's general commercial liability policy. Instead, the clause was added by a later endorsement with the following language:

SECTION II, WHO IS AN INSURED, is amended by the following:

    A. Paragraph 2. Is amended to include the following as insureds:

        e.          Any legally incorporated entity of which you own at least 51% of the voting stock on the inception dates of this Coverage Form and on the date of any covered 'occurrence,' claim or 'suit.'

         This insurance shall not apply to any entity that is already an insured under any other insurance provided by any company or that would be an insured but for the exhaustion of its limits of insurance.

ROA at 72.

So following the endorsement's direction, we must place the new language in the context it belongs, in Paragraph 2 of Section II of the original policy, with its addition in italics for easy identification:

SECTION II: WHO IS AN INSURED

    1.      If you are designated in the Declarations as:

        a.      An individual . . . owner.
        b.      A partnership or joint venture . . . .
        c.      A limited liability company . . . .
        d.      An organization other than a partnership, joint venture or limited liability company . . . .
        e.      A trust . . . .

         [then you are insured.]

    2.      Each of the following is also an insured:

        a.      Your 'volunteer workers' . . .
        b.      Any person . . . or organization while acting as your real estate manager.

> c.      Any person or organization having proper temporary custody of your property if you die . . . .
> d.      Your legal representative if you die . . . .
> e.      *Any legally incorporated entity of which you own at least 51% of the voting stock on the inception dates of this Coverage Form, and on the date of any covered 'occurrence,' claim or 'suit.'*
>
> *This insurance shall not apply to any entity that is already an insured under any other insurance provided by any company or that would be an insured but for the exhaustion of its limits of insurance.*

ROA at 66, 72.

Now Markel's contextual problem materializes before us. The escape clause appears only in Paragraph 2 and can be read as applying only to entities listed in that paragraph. To be sure, as Markel stresses, the escape clause uses broad language, stating "this insurance" shall not apply to "any entity" already insured under another policy. But it isn't clear what "this insurance" and "any entity" refer to. The terms might refer to the insurance provided to any of the entities covered by Paragraphs 1 and 2, just as Markel says. But they might as easily refer to the insurance provided to entities identified in Paragraph 2, and only Paragraph 2, where (after all) the escape clause actually makes its entrance. For that matter, the terms might refer only to the additional insured entities covered by Paragraph 2(e), a possibility suggested by the fact that the endorsement says its new language is intended only to "include . . . as insureds" entities identified in a new subparagraph (e), not to restrict the coverage of other

- 6 -

entities. Both of these latter interpretive possibilities pose serious problems for Markel because Brewer and its haunted house were insured not under Paragraph 2 but under Paragraph 1(d). *See* ROA at 61 (declaration listing "Brewer Entertainment, Inc." as a named insured pursuant to Paragraph 1(d)).

If the immediate context casts a shadow over Markel's reading of the escape clause, surrounding context darkens it. In Section IV of Markel's policy we come upon a provision conspicuously titled "Other insurance," addressing exactly the subject its heading suggests. *See* ROA at 68. The provision states (subject to various exceptions not relevant here) that Markel's insurance provides "primary" coverage. And it adds that, if another insurance policy is also "primary" (as Western World's is), the two carriers will share the cost of coverage according to a specified formula — either in equal shares or *pro rata* based on policy limits, all depending on the contents of the other policy. *Id.*

This poses a problem for Markel because its reading of the escape clause renders its own "Other Insurance" provision a dead letter. Under Western World's interpretation of the contract, Section IV's "Other Insurance" provision states the general rule that Markel will provide co-insurance and the escape clause provides a limited exception for entities insured under Section II paragraph 2 — certainly a plausible (if not metaphysically compelled) reading, one that at least gives some effect to every provision in the policy. Yet under Markel's interpretation of the contract, the escape clause absolves it of *all* liability when

another insurer is lurking about — an interpretation rendering Section IV's "Other Insurance" provision more apparitional than corporeal. And that has to be a serious strike against Markel's interpretation given contract law's abhorrence of words without meaning and other superfluities. *See Bituminous Casualty Corp. v. Cowen Constr., Inc.*, 55 P.3d 1030, 1033 n.15 (Okla. 2002) ("[t]he whole of a contract is to be taken . . . so as to give effect to every part, if reasonably practicable") (internal quotation marks omitted).

Of course, Markel isn't without a response. It rejoins that endorsements "clear[ly] and unambiguous[ly]" replacing provisions in the body of a policy must be read to control over the supplanted policy language. *Id*. at 1035. But while we do not doubt that truism, neither do we discern its relevance. If Markel's endorsement clearly and totally supplanted the contract's "Other Insurance" provision, we would of course enforce it according to its terms. But the language of the escape clause gives no hint of such a design. To the contrary, the language of the endorsement alerted Western World only that "SECTION II, WHO IS AN INSURED, is amended." And amended only "to include the following as insureds," not to limit liability in a radical new way under an entirely separate section of the original policy. There is not a single breath about Section IV's "Other Insurance" provision, let alone any suggestion it has become null and void. If the endorsement was meant to erase Section IV's "Other Insurance" provision, Markel pursued an exceedingly cryptic way to accomplish its purpose.

And this leads us to the dispositive point. Even viewed in its best light, the applicability of the escape clause to an entity, like Brewer, insured under Paragraph 1 is far from clear. And in these circumstances, Oklahoma contract law tells us the tie must go to the insured. "[I]f an insurer desires to limit its liability under a policy, it must employ language that clearly and distinctly reveals its stated purpose." *Spears v. Shelter Mut. Ins. Co.*, 73 P.3d 865, 868 (Okla. 2003). If (as here) the relevant limiting policy provisions are "unclear or obscure," then the objectively reasonable expectations of a person "in the position of the insured" control. *Id.* Put differently, when a policy's escape hatch is less a clearly marked exit than it is a hidden trap door, the reasonable expectations of an insured who has read and become familiar with the policy language supplies the rule of decision. *See Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 P.2d 861, 864-65 (Okla. 1996). This doctrine does not, of course, negate the controlling effect of plain language. The plain terms of the contract are always the best evidence of the parties' intentions and always control. *Spears*, 73 P.3d at 868. But when the terms of the contract are unclear, or when the contract is susceptible to two reasonable interpretations, it is the expectations of the insured that control.

Applying the reasonable expectations doctrine to this case, we have no doubt a reasonable insured in Brewer Entertainment's shoes would have expected coverage from Markel. Expected coverage in light of Markel's general policy

language promising Brewer coverage for accidents just like this one. Expected coverage in light of Section IV's promise that Markel will shoulder the burden of co-insurance. Expected coverage given the fact that the endorsement nowhere mentions Section IV and the escape clause is readily susceptible to a narrow reading. Neither are we directed to any counter-indication that Brewer understood (or should have understood) the escape clause as barring coverage here. In fact, to the extent that the extrinsic evidence points in any direction, it points decidedly against Markel. Markel's five page letter to Brewer explaining its decision to deny coverage rehearsed many other arguments — arguments it gave up the ghost on long ago — but the letter never once mentioned the escape clause. *See* ROA at 118-122. In fact, based upon the record the parties have presented to us it appears the first time Markel itself unearthed the escape clause from the depths of the contract and invoked it as a potential basis for evading liability was only after this litigation began. *See* ROA at 12-13.

We must and do readily concede Markel's complaint that the reasonable expectation doctrine tends to disfavor insurers, that it places a thumb on the scale of the insured seeking coverage. But some ambiguity-resolving rule of decision is necessary. And the Oklahoma Supreme Court has adopted the rule it has because, often enough in its view, "[i]nsurance contracts are contracts of adhesion" forced by insurers on insureds with inferior bargaining power. *Spears*,

73 P.3d at 868. Neither may we, obliged to apply state law in this diversity action, rightly do anything other than faithfully follow that state policy direction.

Of course, few rules lack exceptions. And it's at least conceivable Oklahoma might someday choose to create an exception to the reasonable expectations doctrine for cases where (arguably as here) both parties to the insurance contract are sophisticated and able to vindicate their interests without any extra help. But no such exception yet exists, Markel has not argued for the adoption of one, and neither is it obvious whether Oklahoma would take up the invitation. After all, when it adopted the reasonable expectations rule the Oklahoma Supreme Court was surely well aware that not every insurance contract is an adhesion contract. And we can just as easily imagine Oklahoma would frown on an exception to its bright line and easily applicable (if overbroad) rule that invites parties to waste time and fortunes litigating a side-show about their relative bargaining power. Especially when sophisticated insurers (like Markel) can much more easily and inexpensively avoid the sting of the reasonable expectations doctrine by the expedient of drafting clear and plain escape clauses courts can enforce.

The district court's decision granting summary judgment to Markel is reversed and this case is remanded for further proceedings.